UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

ROBERT BALZER AND
PAULA BALZER

v.                              CIV. NO. 3:10CV1740 (SRU)

JOHN MILLWARD, TREVA COOKE,
DYLAN COOKE AND
BLUE FLAME, LLC

RULING ON PLAINTIFFS' APPLICATION
FOR PREJUDGMENT REMEDY

Plaintiffs Robert and Paula Balzer bring this action to recover damages from defendants John Millward, Treva Cooke, Dylan Cooke and Blue Flame, LLC, arising out of the breakdown of an alleged partnership. [Doc. #29, First Amended Complaint].

Plaintiff moves for a prejudgment remedy against Defendant Blue Flame, LLC in the amount of $26,560.56. [Doc. #21]. A hearing was held on February 18 and March 25, 2011. [Doc. ##34, 40].

In support of their application for entry of a PJR, plaintiffs presented the testimony of Treva Cooke, Paula Balzer, Peter Olson, Robert Balzer, and John Millward; introduced exhibits 1, 7, 8, 9, 11, 12, 14, 15, 16, 17, 18, 19, 20, 25, 27, 28, 31, 32, 35, 36, 37, 38, 39, 40, 43, 48 and 49; and filed the affidavit of Paula Balzer. [Doc. ##21-1, 35, 36, 41, 42]. Opposing plaintiffs' motion, defendants offered exhibits D, G-1,

1

H, I, J, K, L, M, N and O, and the testimony of John Millward and Paula Balzer. [Doc. ##36, 43].

I. <u>PROBABLE CAUSE STANDARD</u>

To grant a motion for prejudgment remedy of attachment, the court must make a finding of "probable cause." Connecticut General Statutes § 52-278c(a)(2) requires that the application include:

> An affidavit sworn to by the plaintiff or any competent affiant setting forth a statement of facts sufficient to show that there is probable cause that a judgment in the amount of the prejudgment remedy sought, or in an amount greater than the amount of the prejudgment remedy sought, taking into account any known defenses, counterclaims or set-offs, will be rendered in the matter in favor of the plaintiff.

Connecticut General Statute §52-278d provides that a PJR hearing is limited to a determination of "whether or not there is probable cause that a judgment in the amount of the prejudgment remedy sought, taking into account any defenses, counterclaims or set-offs, will be rendered in the matter in favor of the plaintiff."

"Probable cause," in the context of a prejudgment remedy, has been defined by Connecticut courts as "a bona fide belief in the existence of the facts essential under the law for the action and such as would warrant a man of ordinary caution, prudence and judgment, under the circumstances, in entertaining it." <u>Three S.</u>

Dev. Co. v. Santore, 193 Conn. 174, 175 (1984) (quotation marks and citation omitted).

In other words, in addressing PJR applications, the "trial court's function is to determine whether there is probable cause to believe that a judgment will be rendered in favor of the plaintiff in a trial on the merits." Calfee v. Usman, 224 Conn. 29, 36-37 (1992) (citation omitted). A probable cause hearing for the issuance of a prejudgment remedy "is not contemplated to be a full scale trial on the merits of the plaintiff's claim." Id. at 37. The plaintiff need only establish that "there is probable cause to sustain the validity of the claim." Id. Probable cause "is a flexible common sense standard. It does not demand that a belief be correct or more likely true than false." New England Land Co. v. DeMarkey, 213 Conn. 612, 620 (1990) (citation omitted). "[T]he Court must evaluate not only the plaintiff's claim but also any defenses raised by the defendant." Haxhi v. Moss, 25 Conn. App. 16, 20 (1991) (citation omitted).

Moreover, "damages need not be established with precision but only on the basis of evidence yielding a fair and reasonable estimate." Burkert v. Petrol Plus of Naugatuck, Inc., 5 Conn. App. 296, 301 (1985) (citation omitted).

II. FINDINGS

After considering the evidence presented, the Court finds the following facts for the limited purpose of deciding the instant PJR.

Blue Flame, LLC, was started in 2005 by defendants Treva Cooke and John Millward. (Tr. Feb. 18, 2011 at 4, 72). Blue Flame, headquartered in Norwalk, CT is in the business of marketing and live event promotions. In 2008, Treva Cooke approached Paula Balzer to come to work for Blue Flame. (Tr. Feb. 18, 2011 at 12-13). Paula Balzer and Treva Cooke went to college together, and throughout the years, worked together on different ventures. Paula Balzer, with vast experience in marketing and public relations, began working for Blue Flame in July 2008 as a "change agent for the company". (Id. at 16). Her responsibilities included "helping with the organizational structure of the company, helping to set up the different systems, strategy development for both new clients and existing clients". (Id.). Plaintiffs allege that in addition to offering Ms. Balzer employment with Blue Flame, effective October 1, 2008, Ms. Balzer was made a partner of Blue Flame, LLC. As a partner, Ms. Balzer was paid a monthly $15,000 net draw. (Id. at 14).

Robert Balzer joined Blue Flame in early 2009 to perform accounting functions, including bookkeeping, creating and implementing policies and procedures for bookkeeping, maintaining

4

general ledgers, improving accounts receivable and accounts payable; in all, getting the company in financial shape. (Tr. Feb. 18, 2011 at 120). Plaintiffs allege that Robert Balzer was made a partner of Blue Flame LLC in September 2009. As a partner, Mr. Balzer was paid a biweekly net draw of $3,700. (Tr. Feb. 18, 2011 at 123).

In October of 2010, the work relationship between the Balzers and John Millward and Treva Cooke deteriorated. As part of the falling-out, on October 25, 2010, the Balzers were denied access to the Blue Flame bank and e-mail accounts. (Tr. Feb. 18, 2011 at 30). Despite defendants' efforts to disengage the Balzers from Blue Flame, Paula Balzer saw through two events that Blue Flame was committed to staging, the first for Google in California and the second for Duane Reed. (Id. at 31-32). Ms. Balzer did work on behalf of Blue Flame through November 12, 2010. (Id. at 36). The Google and Duane Reed events brought revenues to Blue Flame totaling approximately $250,000. (Id.). In connection with staging the two events, Ms. Balzer incurred expenses for which she has not been reimbursed. (Id.). Specifically, Ms. Balzer charged $6,320.08 to her Blue Flame corporate American Express credit card, out of which $5,832.68 are business expenses.[1] [See Pl's Ex. 35]. She also incurred out-

---

[1] Paula Balzer testified that charges for JetBlue Tickets on November 10, 2010, which totaled $487.40, were nonbusiness expenses.

of-pocket expenses for her work on behalf of Blue Flame totaling $1,540.48, [Pl's Ex. 43], for which she was not reimbursed. Finally, between October 15 and November 12, 2010, Blue Flame did not pay Ms. Balzer her salary or guaranteed draw, which was $15,000 a month. (Tr. Feb. 18, 2011 at 165).

From the date of the falling out, through the end of the month, Mr. Balzer worked on mitigating damages, which included dealing with complaints from the staff and working on alternative sources of financing. (Tr. Feb. 18, 2011 at 141-142). Mr. Balzer was not paid his biweekly draw of $ 3700 for the work he did for Blue Flame from October 15, 2010 through the end of the month. (Id. at 136-137).

III. DISCUSSION

Plaintiffs allege in Count Two of the complaint that, "Defendants' refusal and failure to fulfill their obligations pursuant to the agreement with the Plaintiffs and their respective ownership interest in Blue Flalm [sic] is a breach." [Doc. #15, ¶26]. "The elements of a breach of contract claim are: (1) the existence of a contract; (2) a breach of the contract; and (3) damages resulting from the breach." Bastanzi, 2005 WL 5543590, at *4 (citing Chem-Tek, Inc. v. Gen. Motors Corp., 816 F. Supp. 123, 131 (D. Conn. 1993) (citing O'Hara v. State, 218 Conn. 628 (1991))).

1. <u>Existence of a contract (partnership agreement)</u>

The "agreement" referenced in the complaint is an agreement to form a partnership. Both parties agree that until October 25, 2010, Robert and Paula Balzer performed work for and on behalf of Blue Flame and that they were compensated and given benefits for this work. The main issue in dispute is whether the plaintiffs were made partners in Blue Flame.

It is undisputed that the parties never executed an operating agreement memorializing a partnership agreement.[2] However, contrary to defendants' position, a "written contract of partnership is not necessary to the formation of a partnership." 59A Am. Jur. 2d Partnership § 90.

A partnership is a contractual relation, which may be implied from conduct and circumstances alone. <u>See</u> 59A Am. Jur. 2d Partnership § 89. Connecticut General Statutes § 34-314(a) defines the formation of a partnership as follows: "the association of two or more persons to carry on as co-owners a business for profit forms a partnership, whether or not the persons intend to form a partnership." The elements of a partnership as expressed by the courts, generally include,

> an association of persons to combine property, money,

---

[2] Defendants testified that there were conversations about partnership and all aspects of partnership but that the parties never advanced beyond a redline agreement.

7

> effects, skill, and knowledge under a contract or agreement to carry out a lawful business enterprise for profit; co-ownership of the business enterprise; the conduct or contemplation of business activity; a community of interest in the business profits, management, and control; and the sharing of profits and losses from the business enterprise.

59A Am. Jur. 2d Partnership § 131. "The filing of a partnership tax return is also characterized as creating a presumption of partnership, as pertinent to establishing its existence, or as significant evidence of partnership under state and federal income tax laws that permit a business partnership return to be filed only on behalf of an enterprise created to carry on a business." 59A Am. Jur. 2d Partnership § 191.

In light of the evidence, the Court finds that there is probable cause to believe that the parties had established a partnership. The fact that the parties had been working on drafting and executing a formal operating agreement does not negate the fact that the Balzers were already partners of Blue Flame, as evidenced by the equity issued to the Balzers, the treatment by defendants of the Balzers as partners, and the Blue Flame partnership tax returns.

The Court finds the Balzers received equity in Blue Flame; John Millward, in various e-mails, referenced equity that was "issued" to the Balzers. The first e-mail -subject line: "partners meeting"- states, "It was my understanding that when we <u>issued additional equity</u> to Paula that all partners would receive

8

the same base pay." [Pl's Ex. 8 (emphasis added)]. The second e-mail -subject line: "Partner Pay"- referencing Robert Balzer's equity, states, "We also <u>issued 8% ownership</u> in recognition of Bob's efforts". [Pl's Ex. 16 (emphasis added)].

The equity issued is reflected in the 2009 partners distribution analysis that Robert Balzer e-mailed to Treva Cooke and John Millward. [Pl's Ex. 9]. The record before the Court establishes that defendants never denied or called into question the accuracy of the report.

Most compelling are the 2008 and 2009 tax returns for Blue Flame, LLC. [Pl's Ex. 37 and 38]. The 2008 tax return states that in 2008 Paula Balzer was a partner of Blue Flame with a 25% share of the "profit, loss, and capital". [Pl's Ex. 37]. The 2009 tax return states that Paula Balzer's equity was reduced to 23% and Robert Balzer was issued 8% equity by the end of 2009. [Pl's Ex. 38]. The tax returns were prepared by Peter Olsen, who was introduced to Treva Cooke and John Millard by the Balzers, yet Mr. Olson continues as Blue Flame's accountant despite the falling out.[3] Mr. Olsen, a disinterested witness, testified that he discussed the 2008 tax return with all four partners. Specifically, he testified that "percentages were discussed" and

---

[3] Q: You do personal work –As of today you've been engaged by John and Treva and Blue Flame?
A (Olsen): As far as I know, I'm still getting calls from Dylan [Treva's son who works for Blue Flame]. (Tr. Feb. 18, 2011 at 107).

9

that he explained that "partners who aren't getting payroll will have a draw and they have to pay their own estimated taxes." (Tr. Feb. 18, 2011 at 92). Mr. Olson also prepared the 2009 tax return which was discussed with all four partners on a scheduled phone call. (Id. at 102).

Blue Flame, LLC issued equity to the Balzers in exchange for their work and expertise in marketing and live event promotion and accounting. The Court finds that, by agreement, the Balzers were made partners of Blue Flame, LLC and treated as partners by Treva Cooke and John Millward. [Pl's Ex. 39 and 40].[4] The first element of the Balzers' cause of action is satisfied.

### 2. Breach of Contract and Damages

The evidence establishes that defendants breached the partnership agreement with plaintiffs, causing plaintiffs monetary damages. Martin v. Dupont Flooring Systems, Inc., No. 3:01CV2189 (SRU), 2004 WL 726903, at *3 (D. Conn. Mar. 31, 2004) (Breach of contract is an "unjustified failure to perform all or any part of what is promised in a contract."). As partners, plaintiffs were promised a net draw, which was not paid to the Balzers as of October 15, 2010, despite the fact that plaintiffs continued to work for and on behalf of Blue Flame. Failure to pay

---

[4] On October 22, 2010, Bob Balzer sent a letter to John Millward in which he writes "I do not work for you – I am a partner in this company". Pl's Ex. 1. This fact was not refuted by John Millward in his response e-mail. [See Pl's Ex. 20].

10

plaintiffs their draw constitutes a breach. Further, Blue Flame issued business credit cards to all partners for business expenses with the understanding that they would be reimbursed by Blue Flame for these and any other out-of-pocket business-related expenses. Failure to reimburse Paula Balzer for the business expenses incurred from October 25, 2010 through November 11, 2010 for Blue Flame events constitutes a breach.[5] The second and third elements are satisfied.

Based on the evidence presented, the Court finds probable cause to believe that a judgment in the amount of $26,073.16 will be rendered in favor of plaintiff on Count II in a trial on the merits. Calfee v. Usman, 224 Conn. 29, 36-37 (1992); see Conn. Gen. Stat. §52-278c(a)(2). At the second hearing, defendants, for the first time, raised the issue that their counterclaims provided them with an offset. However, no evidence was introduced to support that claim.

IV. AMOUNT OF ATTACHMENT

The Court awards plaintiffs an attachment of $26,073.16 as follows:

P. Balzer's draw from Oct 15-Nov 12, 2010          $ 15,000.00

---

[5] This is especially true in light of the evidence that Blue Flame was paid by Google and Duane Reed over $250,000 for the events for which the expenses were incurred.

| | |
|---|---|
| Blue Flame, LLC American Express bill | $ 5,832.68[6] |
| Out of pocket expenses incurred for Duane Reade event on behalf of Blue Flame, LLC | $ 1,540.48 |
| R. Balzer's draw from Oct 15-Oct 31, 2010 | $ 3,700.00 |
| **TOTAL** | **$26,073.16** |

V. CONCLUSION

Based on the foregoing, plaintiff's Application for a Prejudgment Remedy **[Doc. #21]** is **GRANTED** in the amount of $26,073.16.[7] Defendants will comply with this ruling and order within fourteen (14) days.

Entered at Bridgeport this 21st day of April 2011.

_____/s/_____
HOLLY B. FITZSIMMONS
UNITED STATES MAGISTRATE JUDGE

---

[6] Defendants argued that expenses for Debbie Toler, Ms. Balzer's assistant, on October 27, 2010 should be deducted because defendants had asked Ms. Balzer to fire Ms. Toler. This Court, having found probable cause that Ms. Balzer is a partner of Blue Flame, rejects this argument.

[7] See Aetna Life Ins. Co. v. Toothsavers Dental Serv., No. 96 CV 570 (GLG), 1997 WL 102453 (D. Conn. Feb. 4, 1997) (finding referral to Magistrate Judge "for the purpose of a hearing on prejudgment remedy" was a request for a determination of the prejudgment remedy pursuant to 28 U.S.C. §636(b)(1)(A) and was not a recommended ruling effective only upon a District Court Judge's review and adoption, pursuant to 28 U.S.C. §636(b)(1)(B)).